### FREYTAG *vs.* HOELAND.

1. An answer, though responsive on the point in controversy, sworn to before an officer in another state, not authorized by the statutes of this state or the rules of this court to take an oath to an answer, has no weight as evidence; it must be treated as a pleading only.

2. When the controversy is as to the fact whether a deed was intended as security only, the burden of proof is on the grantor, and his oath against that of the grantee is not sufficient to change a deed absolute on its face into a mortgage.

3. But where the mortgagee admits that he required an absolute deed as security for a debt, without any recital to show what the debt was, and the mortgagor testifies that the consideration expressed in the deed was the debt it was intended to secure, the burden of proof is on the mortgagee to show that it was given as security for a greater amount.

4. The grantee in such case must re-convey on payment of his debt, and if the net rents and profits exceed the amount the deed was given to secure, and interest, he must repay such excess.

---

This cause was argued on final hearing upon bill, answer, replication, and proofs.

*Mr. Winfield,* for complainant.

*Mr. A. S. Jackson,* for defendant.

THE CHANCELLOR.

The controversy in this case between the parties relates to a deed given by the complainant to the defendant, for a house and lot in Jersey City, dated July 17th, 1869. Both admit that the deed, though absolute on its face, was given as secu-

rity only, and is, therefore, in effect a mortgage. The complainant contends that it was given as security for the sum of $700, advanced at the time and mentioned in the deed as the consideration, and for that only. The defendant contends that it was given not only as security for that sum, but also for previous advances to the amount of about $5300, made by him to Freytag and his family, and for which he was indebted to defendant. Freytag not only denies that the deed was intended to secure these advances, but that they were ever made to him or on his credit. He states that such part as was advanced, was advanced to his wife and daughter for a different consideration, and that he is not and never was liable for it. On both these points, whether the mortgage was given to secure the $700 only, or all debts due from Freytag, and the amount of these debts, if any, there is a mass of conflicting and contradictory testimony. The circumstances that surround the case are novel and peculiar, and it is not easy to decide which side to believe. The conflict is such as involves perjury somewhere.

Hoeland is, by occupation, a butcher; he followed his trade in Newark, in this state, and afterwards went to California and to Nevada, where he also followed it, and in addition, speculated in lots and mining rights. He was successful in making money to the amount of some thousands of dollars, and advanced at least $2000 or $3000 to the wife and daughter of Freytag.

Freytag was a carpenter; he worked at his trade in Newark in 1852 and 1853, when he became acquainted with Hoeland, who boarded in his family for some months of the time. At this time there was a proposition from Mrs. Freytag to Hoeland, or from Hoeland to Mrs. Freytag, to elope together and leave Mr. Freytag and the child. Both testify that there was such a proposition; each testifies that the offer came from the other party, and that it was virtuously rejected by the party testifying. The result was that Hoeland, for a time, ceased boarding there, and he and Mr. Freytag had an encounter, in which Freytag received a wound over his eye,

the scar of which remains. Mrs. Freytag says the proposition was made through a Mrs. Englehorn. Mrs. Englehorn denies this and supports Hoeland's version of the matter. The weight of testimony, as to this affair, is on Hoeland's side. After this, Hoeland was again received as a boarder by Mrs. Freytag, and was on very friendly and confidential terms with her. When Katinka, the daughter of Mr. and Mrs. Freytag, who was born in 1846, grew up towards womanhood, Hoeland, who was unmarried, took a fancy to her, and expressed a desire to make her his wife when the proper time should arrive. This seemed to be assented to by Mrs. Freytag, and she and Hoeland seemed to act in unison in attempting to accomplish this object. Katinka knew of their purpose and submitted passively to their measures, though it does not appear that she ever positively assented to it, or was willing to bind herself by an engagement to Hoeland. Freytag knew of this design and acquiesced passively, as he seemed to do in everything done by his wife; he was of an easy disposition and much under her control, and though a good workman and earning good wages, he did not accumulate; he had little capacity for business, but was easily controlled by any one in whom he had confidence or who came in contact with him.

Katinka showed some talent for music and singing, and took lessons to fit her for taking part in concerts and the opera. Money was solicited from Hoeland by her mother and herself to enable her to continue her lessons, and was furnished by him. In 1868, Freytag, his wife, and daughter went to Europe; he returned, but Mrs. Freytag and Katinka remained and went to Italy and stayed at Milan for Katinka's musical education. There Hoeland sent money to them at the earnest and repeated requests of the daughter, who, in one of her letters, almost promised to come back to him in San Francisco. He assures her that he could support her and her dear mother. The whole tone of the correspondence shows that on both sides it is conducted without regard to Freytag,

and independent of him, and that Hoeland's object was to separate his wife and daughter from him.

It would not be strange if a young woman of promise, however humble her origin, who had taken lessons of masters of music, especially in Italy, where the art has reached its highest cultivation, should show some reluctance to fulfill an engagement made for her in childhood, and marry a practical butcher far older than herself, and live with him in Nevada or California. Some indications of this feeling, or perhaps a conclusion that mother and daughter had been using his attachment and hopes to obtain his money without any regard to fulfilling his expectation, seems to have aroused Hoeland to his situation, and to have changed his course regarding them.

The advances made by him had commenced in 1863, and been continued until 1869. All or nearly all claimed by him to have been made, were made to Katinka or Mrs. Freytag, all in the name of Mrs. Freytag, which Katinka signed and endorsed as her own. For none of them was any note, memorandum, or other security taken. Hoeland had no proof of any advance in his possession. He has procured from bankers the drafts by which remittances were made; for some he has letters of Mrs. Freytag or Katinka, acknowledging the receipt; while for the largest single advance, being $1200, his only proof is his own testimony, that he handed it to Mrs. Freytag, which she denies on oath.

In this situation of affairs in the summer of 1869, Hoeland came to Jersey City; Freytag was there; Mrs. Freytag and Katinka were in Europe. Mr. Freytag owed one Mr. Diffany $700 on a note that was due. Diffany was pressing for his money; his attorney, Mr. Brown, wrote to Freytag, requiring payment. Freytag applied to Hoeland to lend it on his note, and afterwards on a second mortgage on his house; both these requests Hoeland successively refused. Freytag had a house and lot in Jersey City, bought in 1863, subject to a mortgage for $8000, worth at least $16,000. It was on this that he offered to give a second mortgage. Hoeland

would not advance the money unless he would give him an absolute deed for that house as security. Freytag gave an absolute deed and Hoeland advanced the $700. The deed was drawn, executed, and acknowledged in the office of Mr. Brown, the attorney of Mr. Diffany, and the $700 was paid to him in discharge of the note.

So far both agree: but Freytag contends that the deed was given as security for the $700 then advanced, and for that only; while Hoeland contends that it was for the $700 and the amounts which he had before advanced. Either bargain was just and fair. If Freytag considered the advances to his wife and daughter as made on his account, and was willing to secure them, it was just that he should include them in this deed. If he was not willing, or was not asked to secure them, and the deed was given as security only for the $700 then advanced, it is right that it should stand for that only. Hoeland retains the same right that he before had to claim and recover these advances from Freytag in a suit at law. The question now to be determined is, whether this deed, by the agreement of the parties, was given to secure $700 only. Freytag testifies that it was expressly given for that amount only. Hoeland, on the other hand, testifies that it was given to secure the other advances as well as the $700. Hoeland's answer does not aid him, for even if responsive on this point, it was not sworn to before any officer authorized by the statutes of this state or the rules of this court to take the oath to an answer; it was sworn to before a justice of the peace in Nevada. It can have no weight as evidence, and must be treated as a pleading only. If the contest was about the fact whether the deed was intended as security, the burden of proof would be upon Freytag, and his oath against that of Hoeland could not be sufficient to change a deed absolute on its face into a mortgage. But Hoeland, by the allegations of his answer and in his testimony, admits that the deed was given as security. And when a mortgagee admits that he required an absolute deed as security for a debt, without any recital to show what the debt was, it would seem right, if the

burden of proof is thrown on either party, that he should assume it. To require an absolute deed under such circumstances is oppressive, if not unfair, and the hardship, if any, should be upon him who exacts it.

But if the testimony of each party should be given the same weight, there are facts and circumstances attending the transaction which seem to confirm the account given by Freytag, and to show that this deed was intended as security only for the $700 then advanced.

In the first place, Hoeland says in his testimony, after stating the understanding or agreement which he alleges was made between him and Freytag, that "Mr. Freytag explained it to Brown, and told Brown that he should make out the deed—that it was all right." Mr. Brown was the attorney who had the deed drawn; he would hardly have inserted $700 as the consideration, if he had been told that it was to secure a much larger sum, and Mr. Brown testifies that although the parties talked together, before him, about other money claims, he knew of no other, and had nothing to do with any other than the $700. If Freytag, as Hoeland testifies, told him the whole arrangement between them, an intelligent counselor-at-law would have noticed it, and could not have forgotten it. Brown knew it was a deed given as security, and both Hoeland and Wood, Brown's clerk, who drew the deed, say that Brown cautioned Freytag against giving an absolute deed to Hoeland, unless he had perfect confidence in him. W. H. Wood, then clerk in the office of Brown, now a practicing attorney-at-law, drew the deed by Brown's direction, and was present at the execution and acknowledgment; he heard nothing about it being given as security for anything but the $700, and says that Freytag, at the time of the execution, repeated, " I give mortgage for $700," which, being almost part of the res gestœ, shows what Freytag understood at the time.

Again, the fact that $700 was inserted in the deed as the consideration is entitled to weight, both as some proof of what the consideration really was, and as yet stronger proof

of what Freytag considered it to be. It seems to me very improbable that this deed could have been given under the circumstances here existing, without Mr. Brown or Mr. Wood having any knowledge that it was security for any sum beyond the $700 then paid down. It is easy to conceive that Hoeland supposed that, having an absolute deed, and thus the control of the whole property, he could exact the payment of the amounts advanced to Mrs. Freytag and the daughter before he would re-convey, and concluded, as Freytag agreed to give him an absolute deed, it was by agreement, as well as in effect, a security for the whole; and the transition in testimony, from the effect to the fact of agreement, is often easily made, as experience teaches us. But it is not necessary to explain how Hoeland may be under the impression that Freytag agreed to such security. If the evidence leads to the conclusion that no sum was agreed to be secured, except the sum then advanced, this deed can only be security for that amount.

Hoeland took possession of the premises soon after the deed to him, and has received the rents and profits. An account must be taken of the rents and profits received by him. And Hoeland must be decreed to re-convey the property to Freytag, upon receiving the excess of the $700, with interest from July 17th, 1869, above the net rents and profits; or, if the net rents and profits exceed the $700 and interest, he must re-convey, and also pay such excess to Freytag.